# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **DOUGLAS CLAYTON** | * | **CIVIL ACTION** |
| **VERSUS** | * | **NO. 2:11-cv-2276** |
| **JOHN H. STONE OIL DISTRIBUTOR, LLC** | * | **JUDGE: HELEN G. BERRIGAN** |
| | * | **MAG. JUDGE: KAREN ROBY** |
| | *    *    * | |

## ORDER AND REASONS[1]

Before the Court is a Motion for Summary Judgment filed by Defendant, John W. Stone Oil Distributor, LLC ("Defendant"). (Rec. Doc. 28). Plaintiff Douglas Clayton ("Clayton") opposes the motion. (Rec. Doc. 43). Having considered the memoranda of counsel, the record, and the applicable law, the Court finds that the Motion for Summary Judgment should be DENIED for the following reasons.

## I. BACKGROUND

Clayton, an African American man, filed this suit against Defendant seeking damages for hostile work environment, racial discrimination and retaliation under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–2, *et seq*. and for intentional infliction of emotional distress. (Rec. Doc. 1 at 3-4). Clayton also alleges he was retaliated against because Defendant terminated his employment due to his race and for Clayton's multiple complaints to management regarding harassment against him and his desire to be reassigned to work on a different location.

---

[1]Jessica Earl, a third-year student at Tulane University Law School, assisted in the preparation of this Order and Reasons.

1

(Rec. Doc. 1, at 2-3).

There is no dispute that Defendant is a marine fuel distributor servicing vessels in the Baton Rouge and New Orleans area. (Rec. Doc. 28-3, at 22). Clayton was employed by Defendant as a deckhand aboard Defendant's vessels. *Id.* at 28. Clayton began his work for Defendant as a deckhand aboard the M/V STEPHANIE STONE. *Id.* at 29. Clayton worked a 14 day hitch followed by 7 days off, and during the hitch, Clayton lived, slept, and ate aboard the vessel, along with the STEPHANIE STONE's other crew members. *Id.* Other crew-members included two captains and a deck crew of four people. *Id.* at 29-30. Clayton alleges that after receiving repeated racially discriminatory remarks from his coworkers Ryan Williams ('Williams') and David LeBlanc ('LeBlanc'), Clayton alleges that he and LeBlanc finally had a verbal altercation on a barge in Alabama during their shift, in which LeBlanc told Clayton to "get your stupid mother f**king n**ger ass off this boat", among other remarks. *Id.* at 52-55. Clayton alleges that LeBlanc then raised his wrench at Clayton, and Clayton said "if you're going to hit me, hit me" at which time the Captain of the STEPHANIE STONE walked up and broke up the altercation. *Id.* at 54-55. After the dispute, the Captain told Clayton he would report the incident to Marissa Andrews ("Andrews") in Human Resources, and the Captain asked Clayton if he would like to report the incident as well; both men reported the altercation to Human Resources. *Id.* at 55-56.

Defendant further argues that after receiving the complaint from Clayton, Andrews transferred Clayton to the M/V JENNIFER ("JENNIFER") on August 20, 2012. On September 9, 2010, Clayton again called Andrews to report that racial discrimination against him was continuing aboard the JENNIFER, and his coworkers continued to use the term "n**ger" around Plaintiff, among other comments. (Rec. Doc. 28-3, at 82). After reporting this to Andrews, she allegedly told

2

Clayton to "lighten up" and that she had "just put [him] over there [on the new boat]". *Id.* The same day Clayton reported the racial animus on the JENNIFER to Andrews in Human Resources, he alleges that he was engaged in a physical argument with coworkers who had allegedly discriminated against him on the STEPHANIE STONE. *Id.* at 82-83. After completing their shift, most of Clayton's coworkers sat down in the Jennifer's common room to watch the Saints game on television. *Id.* at 84. Clayton alleges that he came into the common room to look for his phone charger, when he heard a coworker yell "n**ger" at an African-American player on the television. *Id.* at 85. Clayton further alleges that he then informed his coworkers he was tired of their use of derogatory terms at work against him and others, and he informed his coworkers if the racial animus continued, he would report it to the Coast Guard. *Id.* at 86. Clayton claims that when he turned to leave the JENNIFER's common room, his coworkers approached him, and he was struck from behind by Ryan Williams, a coworker with whom he had previous issues with aboard the STEPHANIE STONE. *Id.* Upon the hit from Williams, Clayton alleges he turned around and started throwing punches. *Id.* The alleged fight moved from the common room to the hallway to the engine room, upon which three of Clayton's coworkers began kicking and beating Clayton while he was on the floor. *Id.* at 86-87.

As the alleged altercation continued, another boat passed by the JENNIFER and Clayton's coworkers allegedly left the scene of the fight. *Id.* at 87. The captain of the JENNIFER came over the loudspeaker and reported that all JENNIFER employees were to report to work to help fuel up a passing ship. *Id.* at 88. At this time, Clayton called 911 to report the incident. *Id.* While making the 911 call, Clayton realized the JENNIFER was passing very close to a barge and decided to jump from the moving JENNIFER to the barge the JENNIFER was passing. *Id.* The passing barge was

tied to multiple other barges, and Clayton then proceeded to jump from barge to barge until he reached the barge closest to shore. *Id.* at 89-91.  Upon reaching the final barge, Clayton hid and again called 911. *Id.* at 92.  Clayton told the 911 dispatcher he was unaware of his exact location. *Id.*  While waiting for a police response, Clayton allegedly heard Williams yell out to him in his hiding spot "come out mother f\*\*ker..." *Id.* at 93.  Upon hearing Williams's voice, Clayton jumped into the water out of fear and swam the 30-40 feet to shore.  *Id.* at 94.  After reaching shore, Clayton received a call from the 911 dispatcher indicating the police were up on the levee waiting for him, and Clayton recounted the incident with the three officers on shore. *Id.* at 95. Representatives of the St. Charles Parish Sheriff's Office were dispatched and interviewed both Clayton and other of Defendant's employees.  (Rec. Doc. 55-3, at 15-16).  On the same day, Clayton was terminated. (Rec. Doc. 28-2, at 4).  Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission on September 27, 2010. (Rec. Doc. 1, at 3).  He was issued a Notice of Right to Sue on September 2, 2011 and filed suit shortly thereafter. *Id.*

### III. LAW AND ANALYSIS

**A. Summary Judgment Standard**

Summary judgment is proper only when the record indicates that there is not a "genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A genuine issue of fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1996). When considering a motion for summary judgment, this Court "will review the facts drawing all inferences most favorable to the party opposing the motion." *Reid v. State Farm Mut. Auto Ins. Co* ., 784 F.2d 577, 578 (5th Cir.

1986).

The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact ." *Celotex*, 477 U.S. at 323. "If the moving party meets the initial burden of showing that there is no genuine issue of material fact, the burden shifts to the non-moving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial." *Engstrom v. First Nat'l Bank of Eagle Lake*, 47 F.3d 1459, 1462 (5th Cir.1995) (citing *Celotex*, 477 U.S. at 322–24). In order to satisfy its burden, the non-moving party must put forth competent evidence and cannot rely on "unsubstantiated assertions" and "conclusory allegations." *See e.g., Hopper v. Frank*, 16 F.3d 92 (5th Cir. 1994); *Lujan v. Nat'l. Wildlife Fed'n.*, 497 U.S. 871, 871-73 (1990). The mere argued existence of a factual dispute will not defeat an otherwise properly supported motion. *See Anderson*, 477 U.S. at 248. "If the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate. *Id.* at 249–50.

**B. Discrimination Under Title VII**

### i. Hostile Work Environment[2]

To establish claim of hostile work environment under Title VII, a plaintiff must prove: (1) that he belongs to protected group; (2) that he was subjected to unwelcome harassment; (3) that the harassment complained of was based on race; (4) that the harassment complained of affected a term,

---

[2] Defendant argues that Clayton cannot bring a hostile work environment claim because he never alleged this claim in his EEOC complaint or in his initial complaint with this court. (Rec. Doc. 28-1, at n.1). The Court rejects this argument and finds that the initial complaint filed in the record sufficiently sets forth this claim. Fed. R. Civ. P. 8(a)(2).

condition or privilege of employment; and (5) that the employer knew or should have known of harassment in question and failed to take prompt remedial action. *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002); 42 U.S.C.A. § 2000e *et seq.* Harassment "affects a term, condition, or privilege of employment," as required to support hostile work environment claim under Title VII, if it is sufficiently severe or pervasive to alter conditions of victim's employment and create an abusive working environment. *Ramsey*, 286 F.3d at 268; 42 U.S.C.A. § 2000e *et seq.*

Workplace conduct "is not measured in isolation"; therefore, in order to deem a work environment sufficiently hostile, "all of the circumstances must be taken into consideration." *Ramsey*, 286 F.3d at 268. This includes "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* To be actionable, the work environment must be "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998); *see also Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 347 (5th Cir. 2007) (explaining that in determining whether a hostile work environment claim exists, the courts will use a totality-of-the-circumstances test that focuses on frequency). Title VII is intended only to prohibit and prevent conduct "that is so severe [or] pervasive that it destroys a protected class member's opportunity to succeed in the workplace." *Shepherd v. Comptroller of Public Accounts*, 168 F.3d 871, 874 (5th Cir.1999). Title VII's overall goal of equality is not served if a claim can be maintained solely based on conduct that wounds or offends, but does not hinder an employee's performance. *Weller v. Citation Oil & Gas Corp.*, 84 F.3d 191, 194 (5th Cir.1996). It is a "demanding" standard that requires proof of severe or pervasive conduct that can be

characterized as "extreme." *Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998).

Here, the Court finds that Clayton fulfills the first three elements of a hostile work claim for purposes of summary judgment.   First, Clayton is an African-American male and therefore a member of a protected class.   Second, Clayton was subject to unwanted harassment, including repeated use of the word "n**ger", comments made towards Clayton about "your people" and "your black-ass president", as well as his coworker announcing on Clayton's first day on the STEPHANIE STONE that "we have a new n**ger on the boat."  (Rec. Doc. 43-2, at 40-45).   Third, it is clear this harassment was in the form of racial discrimination, especially in reference to the constant use of the word "n**ger".   Courts have emphasized that the alleged facts must indicate that hostility must be directed at the plaintiff and must be based on race. *Ramsey*, 286 F.3d at 268. Here, the use of the word "n**ger" or other discriminatory epitaphs were directed to Clayton himself or used in his presence.

There are a wide range of incidents or behaviors that can make a workplace "uncivil" but a plaintiff must show as one of the Title VII factors that the hostile acts were based on race. *Id.* Here, while there may be some incidents of hostility towards Clayton that do not deal specifically with his race, the facts provided indicate the majority of the harassment was race-based, and there is evidence that Clayton personally experienced these hostile events. *See Septimus v. Univ. of Houston*, 399 F.3d 601, 612 (5th Cir.2005) (holding that harassment experienced by other women was irrelevant when determining whether harassment that plaintiff experienced was sufficiently severe or pervasive to establish hostile work environment claim). Further, the insults directed towards Clayton are alleged to have occurred numerous times throughout his employment with Defendant, including his time on both the STEPHANIE STONE and the JENNIFER, and Clayton indicates he was subject to

harassment more than just "infrequently".

Fourth, Clayton alleges that this race-based harassment led to the altercation on September 9, 2010 aboard the JENNIFER, and that he was discharged as a result.  This allegation fulfills the requirement that the harassment must affect a term, condition or privilege of employment.  Finally, Clayton alleges that Defendant knew of the race-based harassment against him and failed to take action.  Clayton concedes that after the first incident with LeBlanc, Andrews transferred Clayton to a new boat, the JENNIFER, upon his request.  (Rec. Doc. 1, at 2).  Upon the continuation of the harassment, however, Clayton again reported the race discrimination issues to Andrews, and this time he was then told to "lighten up".  *Id.* at 3.  Race-based harassment continued on the JENNIFER despite Clayton's previous complaint to Human Resources.  Defendant knew about the harassment taking place on the new boat, and it did not respond.  Further, Defendant has presented no evidence of a strict-harassment policy in place in the company, that any such policy was made known to all employees of Stone Oil, nor that Clayton unreasonably failed to take advantage of any known company policies provided by Defendant for handling harassment complaints.  *See Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765-66 (1998) (holding employers *may* have an affirmative defense to vicarious liability for a hostile work environment claim if the employer can show by a preponderance of the evidence that the employer exercised reasonable care to *prevent* and correct promptly any harassing behavior, and employee failed to take advantage of preventative and corrective opportunities).  Defendant has not indicated any such policy was in place to punish employees for Clayton's initial complaints, and Defendant did nothing to reprimand LeBlanc after his altercation with Clayton aboard the STEPHANIE STONE.  Based on these facts, the Defendant failed to take any prompt remedial action for purposes of summary judgment.  Clayton has therefore

8

fulfilled the five requirements of a hostile work environment claim.   Accordingly, the Court finds

that Clayton has established that there is question of material fact regarding his claim of hostile work

environment based on race.

### ii. Discrimination

Title VII prohibits an employer from "failing or refusing to hire or ... [from] discharging, or

otherwise discriminating against an individual with respect to his compensation, terms, conditions,

or privileges of employment, because of such individual's race, color, religion, sex, or national

origin." 42 U .S.C. § 2000e–2(a)(1).  Also, under 42 U.S.C. § 2000e(a), employers are prohibited

from discriminating against an employee "because he has opposed any practice made an unlawful

practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any

manner in an investigation, proceeding, or hearing under this subchapter."

A plaintiff may prove discrimination or retaliation under Title VII through direct or

circumstantial evidence. *Nasti v. CIBA Specialty Chemicals Corp.*, 492 F.3d 589, 593 (5th Cir.2007).

Direct evidence is "evidence which, if believed proves the fact of discriminatory animus without

inference or presumption." *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir.2002).

"Because direct evidence is rare, a plaintiff ordinarily uses circumstantial evidence to meet the test

set out in *McDonnell-Douglas*."  *Id; McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)

However, "the McDonnell Douglas test is inapplicable where the plaintiff presents direct evidence

of discrimination."  *Id.* (quoting *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 123, 105 S.Ct.

613, 621–22, 83 L.Ed.2d 523 (1984)).

When, as here, a plaintiff  relies on circumstantial evidence, courts within the Fifth Circuit

apply a modified *McDonnell–Douglas* framework that requires shifting burdens of production to

determine whether an action warrants trial.  *McDonnell Douglas*, 411 U.S. at  802–804; *Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 341 (5th Cir.2005).   Under the *McDonnell–Douglas* framework, the plaintiff has the initial burden to make a prima facie showing of discrimination or retaliation.  *McInnis v. Alamo Cmty. College Dist.*, 207 F.3d 276, 279–80 (5th Cir.2000). To satisfy this burden, the plaintiff need only make a very minimal showing.  *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 41 (5th Cir.1996).  Once the plaintiff makes this showing, the burden shifts to the defendant-employer to articulate a legitimate, non-discriminatory or non-retaliatory reason for the adverse employment action. *McInnis*, 207 F.3d at 280.  "The defendant may meet this burden by presenting evidence that if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action."  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506–08 (1993).

If the defendant  articulates a legitimate non-discriminatory or non-retaliatory reason for the adverse employment action, the burden shifts back to the plaintiff to offer sufficient evidence to prove defendant's reason was either: (1) a mere pretext for unlawful discrimination or retaliation (the pretext alternative); or (2) true, but only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic (the mixed-motive alternative).  *Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 312 (5th Cir.2004); *Price Waterhouse v. Hopkins*, 490 U.S. 228, 241 (1989). Under the pretext alternative approach, the plaintiff must show evidence of disparate treatment or evidence demonstrating that the employer's explanation is false or unworthy of credence.  *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir.2003).   "Evidence demonstrating that the employer's explanation is false or unworthy of credence, taken together with the plaintiff's prima facie case, is likely to support an inference of discrimination without further evidence of [the] defendant's true

motive." *Id.*  "The 'rare' instances in which a showing of pretext is insufficient to establish discrimination are (1) when the record conclusively reveals some other, nondiscriminatory reason for the employer's decision, or (2) when the plaintiff creates only a weak issue of fact as to whether the employer's reason was untrue, and there was abundant and uncontroverted evidence that no discrimination occurred ." *Id.* (citing *Russell v. McKinney Hospital Venture*, 235 F.3d 219, 222 (5th Cir.2000)).

Under the mixed-motive approach, the plaintiff must show that his protected characteristic was a motivating factor in the adverse employment decision.  *Rachid*, 736 F.3d at 312; *see also Louis v. E.Baton Rouge Parish Sch. Bd.*, 303 F.Supp.2d 799, 801-04 (M.D. La. 2003) (explaining that a mixed-motives case arises if an employment decision is based on a mixture of legitimate and illegitimate motives).  If the plaintiff makes such a showing, then the defendant must "prove that the same adverse employment decision would have been made regardless of discriminatory animus." *Rachid*, 736 F.3d at 312.

Assuming that the plaintiff has not presented direct evidence of discrimination, although he arguably has, Clayton has fulfilled his prima facie case for discrimination by establishing he was (1) a member of a protected class because he is African American; (2) he was qualified for his position as deckhand with Defendant's company; (3) he was discharged; and (4) he was otherwise discharged because of his race. *See Bryan v. McKinsey & Co., Inc.*, 375 F.3d 358, 360 (5th Cir. 2004).  The Defendant has satisfied its burden by articulating a legitimate reason Clayton was discharged: his abandonment of the JENNIFER during his working-shift.  Given the vivid race-based character of the facts presented here, the Court finds, in turn, the plaintiff has offered sufficient evidence to prove that this reason was mere pretext or, if true, another motivating reason for the conduct was race for

purposes of summary judgment.

**C. Retaliation Claims[3]**

To succeed on a claim for retaliation, a plaintiff must first make the prima facie showing that: (1) he engaged in activity protected by Title VII, (2) that an adverse employment action occurred, and (3) a casual link existed between the protected activity and the adverse action. *Ikossi-Anastasiou v. Bd. of Supervisors of La. State Univ.*, 579 F.3d 546, 551 (5th Cir. 2009).  An employee engages in a protected activity when [he] has (1) "opposed any practice made an unlawful employment practice" by Title VII or (2) "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing"  under Title VII. *Douglas v. DynMcDermott Petroleum Operations Co.*, 144 F.3d 364, 372-73 (5th Cir. 1998).  By reporting his co-workers' remarks and actions to Defendant's Human Resources and later filing an EEOC claim, Clayton was engaging in activity protected by Title VII.  Further, his termination is, without question, an adverse employment action.

In determining whether a casual link exists between a plaintiff's protected activity and an adverse action, the focus is on whether the final decisionmaker acted in a retaliatory fashion. *Hernandez*, 670 F.3d at 657. The discriminatory statements and actions of ordinary employees are normally not imputable to the employer. *Long v. Eastfield Coll.*, 88 F.3d 300, 305 n.4 (5th Cir. 1996); see also *Price Waterhouse* 490 U.S. at 277.  "Nevertheless, when the person conducting  the final review serves as the 'cat's paw' of those who were acting from retaliatory motives, the casual link

---

[3]The Court's careful re-reading of the motion for summary judgment does not indicate that Defendant raised the argument concerning the viability of a claim for retaliation under Louisiana law in the motion itself.  Rec. Doc. 28.  That issue remains for determination in conjunction with trial.

between the protected activity and adverse employment action remains intact." *Gee v. Principi*, 289 F.3d 342, 346 (5th Cir. 2002).[4]   The ultimate question therefore, is whether the plaintiff can demonstrate that other acts or other employees had any leverage over the official decision. *Russel*, 235 F.3d at 226.

At a minimum, though the Defendant's ultimate decisionmakers may not have themselves acted in discriminatory fashion towards Clayton or retaliated against him as a result of his complaints, they received information allegedly tainted by impermissible retaliatory motives for purposes of summary judgment. Defendant contends that the employer cannot be held liable unless the decisionmaker (the technical decisionmaker or the agent for whom Defendant is the 'cat's paw') is itself motivated by discriminatory animus. (Rec. Doc. 55, at 7).   Animus and responsibility for the adverse action can both, however, be attributed to earlier agents (here, Clayton's coworkers, many of whom are related) "if the adverse action is the intended consequence of that agent's discriminatory conduct." *Staub v. Proctor Hosp.*, 131 S.Ct. 1186, 1192 (2011).   So long as the agents intend, for discriminatory reasons, that the adverse action occur, the employer can be held liable under Title VII. *Id.*   Under traditional tort law, the exercise of judgment by the decisionmaker does not prevent the earlier agent's action (and here, the earlier coworkers' discriminatory animus) from being the proximate cause of the harm. *Id.*   Proximate cause requires only "some direct relation between the

---

[4] The term 'cat's paw' derives from a fable conceived by Aesop, put into verse by La Fontaine in 1679, and injected into United States employment discrimination law by Judge Posner in 1990.  See *Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990).  In the fable, a monkey induces a cat by flattery to extract roasting chestnuts from the fire.  After the cat has done so, burning its paws in the process, the monkey makes off with the chestnuts and leaves the cat with nothing.  A coda to the fable (relevant only marginally, if at all, to employment law) observes that the cat is similar to princes who, flattered by the king, perform services on the king's behalf and receive no reward.

injury asserted and the injurious conduct alleged," and excludes only those "link[s] that are too remote, purely contingent, or indirect." *Hemi Group, LLC v. City of New York*, 130 S.Ct. 983, 989 (2010). The ultimate decisionmaker's exercise of judgment does not automatically render a link to coworkers' bias "remote" or "purely contingent." *Staub*, 131 S.Ct. at 1192. The decisionmaker's exercise of judgment is also a proximate cause of the employment decision, but it is common for employment decisions to have multiple proximate causes. *Sosa v. Alvarez–Machain*, 542 U.S. 692, 704 (2004). Here, Clayton allegedly suffered discriminatory name-calling, a severe beating, and other extremely insulting comments from his coworkers, which in total cannot automatically render the link from the coworkers' bias to the decisionmakers as "too remote".

A jury issue can arise from a decisionmaker's reliance on the views of employees rather than his findings from independent investigation. *Gee*, 289 F.3d at 346-347. Defendant urges the court to consider that Defendant conducted its own independent investigation into the incident that occurred on the JENNIFER and Clayton's reasons for jumping ship (Rec. Doc. 55, at 6). An employer's authority to punish or dismiss an employee is often, however, allocated among multiple agents, not just a single independent investigation. *Straub*, 131 S.Ct. at 1192. To take Defendant's view would assume that Defendant completely isolated the personnel official who discharges employees (Willis), vests the decisions to discharge employees in Willis and asks Willis to completely review an employee's personnel file before taking any adverse action, and therefore the employer is effectively shielded from discriminatory and retaliatory acts. *Straub*, 131 S.Ct. at 1193. This view is completely juxtaposed with the facts presented in the case. Defendant knew of the racial animus against Clayton and knew of Clayton's requests to transfer as a result of racial animus.

Defendant further seems to suggest that even if the decision to discharge Clayton does not

14

suffice to negate the effect of prior discrimination against Clayton, the decisionmaker's independent investigation (and rejection) into the events that occurred on September 9, 2010 and Clayton's allegations of discriminatory animus, negate a finding of fact that the decisionmaker acted with any animus. Thus, if the employer's investigation results in an adverse action for reasons unrelated to the supervisor's original biased action, then the employer will not be liable. *See Straub*, 131 S.Ct. at 1193. The Court declines to adopt this argument. Any bias in the coworkers' allegations or Human Resources's report "may remain a causal factor if the independent investigation takes into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified." *Id.* Independent investigation does not somehow relieve an employer of "fault". *Id.* As such, Clayton's coworkers' discriminatory harassment and retaliatory actions may be imputed upon the final decisionmaker in Clayton's termination for present purposes. The degree to which Defendant's decision to discharge Clayton as a result of its own completely independent investigation into the events on September 9, 2010 is a question of fact which is to be resolved by a jury.

The Supreme Court has also explained that a factfinder may *infer* the ultimate fact of retaliation from the falsity of the explanation. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146-48 (2000). In such cases, a plaintiff may withstand a motion for summary judgment without adducing additional, independent evidence of retaliation. This case provides a straightforward application of this standard. Defendant has offered a plausible nonretaliatory explanation for Clayton's discharge, explaining that Clayton was fired because he left the boat without authorization which is a reason for discharge in Defendant's company. (Rec. Doc. 28-1, at 6). Clayton, however, has provided sufficient evidence to cast doubt on this explanation, thereby enabling a reasonable factfinder to conclude that it was false, and that the decision to fire him was

based on discriminatory animus from coworkers on Clayton's boat that had an influence over the swift decision to discharge Clayton after the alleged fight aboard the JENNIFER. First, Defendant was well aware of the racial animus going on between Clayton and its other employees. After Clayton discussed this discrimination with Defendant's Human Resources Department and was transferred to another boat, the discrimination continued and Defendant did nothing to remedy the situation. When Clayton informed Human Resources a second time that he was continually a victim of discriminatory animus, he was told by Defendant to "lighten up." This indicates that Defendant was aware of racial issues occurring, as Clayton was very clear two times in telling Human Resources about the actions he was suffering aboard both of Defendant's vessels. (Rec. Doc. 28-3, at 81-83).

Second, Clayton has raised an issue as to whether he was treated inferiorly to similarly situated white men who abandoned ship while working for Defendant. Material facts surround the issue as to whether Clayton abandoned the boat because of a voluntary choice, like the two white employees Defendant refers to, or rather as a means of self-protection after a fight between himself and the men who had previously taunted Clayton with racially-tinged remarks. There is no proof that Clayton brought his personal belongings with him when he abandoned the boat, evidencing he was not planning on quitting his job, but was attempting to escape further harm from his coworkers. In addition, Clayton's 911 call to the police station regarding the alleged fight aboard the JENNIFER and his abandonment ship out of fear for his safety, indicate Clayton left his hitch without permission for personal safety reasons.

Finally, Defendant alleges that the proper course of action in these events is to report any issues directly to the boat's captain rather than fleeing from danger. Clayton contends, however, that he did not want to report to the JENNIFER's captain because the captain was the step-father of

LeBlanc, one of his alleged attackers.

Defendant's prompt decision to discharge Clayton in light of the facts presented permit a reasonable factfinder to *infer* that there was some discriminatory motive in Defendant's decision to terminate Clayton, apart from just abandonment of ship.  Clayton has fulfilled his prima facie case; Defendant has offered a legitimate reason for discharge; and Plaintiff has provided sufficient evidence  permitting a factfinder to infer Defendant's reasons were false or pretextual, and in fact Defendant retaliated against Clayton.

Accordingly, the Court does find a casual link between the reports made by Clayton  to Human Resources and Clayton's ultimate termination for present purposes. Summary judgment on this claim is inappropriate.

### D. Intentional Infliction of Emotional Distress

Under Louisiana law, to bring a claim for IIED, the plaintiff must establish that: (1) the conduct of the defendant was extreme and outrageous, (2) the emotional distress suffered by the plaintiff was severe, and (3) the defendant desired or knew that severe emotional distress would be certain or substantially certain to result from his conduct.  *White v. Monsanto Co.*, 585 So.2d 1205, 1209 (La.1991).  "Extreme and outrageous conduct" is defined as "conduct ... so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Id.*; *Dean v. Ford Motor Credit Co.*, 885 F.2d 300, 306 (5th Cir.1989).  "The conduct must be intended or calculated to cause severe emotional distress and not just some lesser degree of fright, humiliation, embarrassment, worry, or the like." *White*, 585 So.2d at 1210.

IIED claims will not lie for mere employment disputes since an employer must be free to

17

demote, transfer, discipline, and terminate employees even though such actions will undoubtably be unpleasant and cause emotional distress. *Johnson v. Merrell Dow Pharm.*, Inc., 965 F.2d 31, 33–34 (5th Cir.1992). "Conduct in the workplace, even if calculated to cause some degree of mental anguish, will rarely be so severe that it will rise to the level of 'outrageous conduct.'" *Barber v. Marine Drilling Mgt., Inc.*, No. 01–1986, 2002 WL 237848, at *8 (E.D.La. Feb. 15, 2002). "[O]rdinary employment disputes, even those involving discrimination and sexual harassment, will rise to the level of [IIED] only in the most unusual of cases." *Id.* Such situations are limited to those where the distress is "more than a reasonable person could be expected to endure." *Nicholas*, 765 So.2d at 1027.

The Court finds that the alleged conduct of the Defendant and its employees, if proven true, can be considered extreme or outrageous enough to sustain an IIED claim. The alleged remarks and actions towards Clayton, causing him to jump off the vessel and swim in the Mississippi River out of fear for his safety, rises to the level of IIED as an indication the person was suffering extreme distress. Clayton's alleged fight and beating from his coworkers while on Defendant's boat were intended to cause Clayton more than mere "fright, humiliation, embarrassment, worry, or the like." *White*, 585 So.2d at 1210. Based on the plaintiffs' proof, the Defendant's employees were trying to physically assault Clayton in order to either intimidate him or cause him severe emotional distress and, at the same time, the Defendant disregarded Clayton's complaints and worry and transferred the allegedly offending coworkers to the new boat with him. These circumstances would support a finding of undue duress on Clayton. Here, there is proof that rises to the level of 'outrageous conduct" for purposes of summary judgment.

## IV. CONCLUSION

Accordingly,

IT IS ORDERED that Defendant's Motion for Summary Judgment is DENIED.  ( Rec. Doc.

28).

New Orleans, Louisiana, this 21st day of September, 2012.

**HELEN G. BERRIGAN**
**UNITED STATES DISTRICT JUDGE**